SOUTHERN PAC. CO. et al. v. INTERSTATE COMMERCE COMMISSION.

(Circuit Court, N. D. California. February 28, 1910.)

1. COMMERCE (§ 98*)—RATES ESTABLISHED BY INTERSTATE COMMERCE COMMISSION—REVIEW BY COURTS.

   The action of the Interstate Commerce Commission in fixing a rate to be charged by an interstate carrier under the legislative power conferred by Interstate Commerce Act Feb. 4, 1887, c. 104, § 15, as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1909, p. 1158), can be reviewed by the courts only on the constitutional ground that it is confiscatory, and such claim should be clearly established to warrant their interference.

   [Ed. Note.—For other cases, see Commerce, Dec. Dig. § 98.*]

2. CARRIERS (§ 26*)—RATES ESTABLISHED BY INTERSTATE COMMERCE COMMISSION—REASONABLENESS.

   A rate fixed by the Interstate Commerce Commission of $3.40 per ton for the carriage of rough green fir lumber and laths from certain points in the Willamette Valley to San Francisco and adjacent points considered, and *held* not invalid as confiscatory.

   [Ed. Note.—For other cases, see Carriers, Dec. Dig. § 26.*]

In Equity. Suit by the Southern Pacific Company and others against the Interstate Commerce Commission. Decree for defendant.

Wm. F. Herrin, P. F. Dunne, W. W. Cotton, F. C. Dillard, and C. W. Durbrow, for complainants.

Luther M. Walter, Robt. T. Devlin, U. S. Atty., and Joseph N. Teal, for defendant.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This suit was brought to enjoin the enforcement of a rate of $3.40 fixed by the Interstate Commerce Commission on rough green fir lumber and laths carried by the complainant railroad

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

companies from certain points in the Willamette Valley, in Oregon, to San Francisco and adjacent points; the Southern Pacific Company having on the 18th day of April, 1907, advanced its theretofore established rate on such lumber for such haul from $3.10 to $5 per ton. The pleadings, as changed since the cause was last presented to the court, no longer raise the point, then made, that the rates so fixed were below the cost of transporting the lumber.

It is well-established law that the fixing of the rates to be charged by public service corporations is a legislative function, from which it necessarily follows that when Congress, as it did, conferred upon the Interstate Commerce Commission the power, in causes properly brought before it, to determine what are and should be reasonable rates to be charged by the carriers of interstate commerce, its action in the premises is conclusive upon the courts, subject of course always to the inhibitions of the Constitution of the United States, which protect such companies, like everybody else, against confiscatory rates. In the case in hand, the main point relied upon by the counsel for the complainants at the bar was that it appears upon the face of the findings and decision of the Commission itself, that it did not fix the rate of $3.40 on the lumber in question as a reasonable rate, in and of itself, but only as a reasonable rate in view of the conduct of the railroad company, under and by reason of which the complainants established their mills and produced the traffic. We do not so interpret the findings and report of the Commission. It appears that the rate so fixed by the railroad company as an inducement to the lumbermen of the Willamette Valley to establish mills there for the production of lumber for transportation to San Francisco and other points was $3.10, which rate was continued for a number of years, and under which numerous mills were established by the lumbermen and a large amount of lumber produced by them and transported by the railroad companies. In respect to that matter, what the case shows is thus briefly stated by the Interstate Commerce Commission:

"Previous to 1898 no lumber was cut in that valley except such as was necessary to supply the local consumption. The ocean could only be reached at Portland upon the north after a rail haul of considerable length, and upon a comparatively high rate, so that lumber cut in the Willamette Valley could not find a market by water in competition with that produced in Portland. The rate to the south was so high as to prohibit shipments in that direction in competition with water carriage from Portland. About 1898 the Southern Pacific Company became convinced that it ought to adopt a policy which would develop the lumber industry along its lines in the Willamette Valley. At that time it had no affiliation with the Union Pacific Railroad or its allied lines, and therefore could obtain no outlet for this lumber through the Portland gateway. Since both the Oregon Railroad & Navigation Company and the Northern Pacific Company had extensive lumber interests of their own which they were bound to protect, the only possible market was to the south and to points in the east reached via the south.

"For several years rates had been in effect from Puget Sound territory and from Portland to Utah, Colorado, and other eastern destinations. In order that lumber produced in the Willamette Valley might be given a market in competition with Washington and Portland mills in this territory, it must go south to Sacramento and east over the lines of the Southern Pacific. There was also an extensive market in San Francisco and adjacent territory. This market could be reached from Portland and from points upon Puget Sound by water, and lumber arriving at San Francisco by water could there be loaded upon the cars and shipped by rail to nearby interior points and

to the eastern points above mentioned. In order, therefore, to give this lumber of the Willamette Valley a market it was absolutely essential to establish a rate from that territory to San Francisco, which was fairly equivalent to the water rate from Portland and from corresponding points. This was perfectly understood by all parties, and the determination of the Southern Pacific was to do precisely this thing.

"What actually occurred in that valley can be best shown by considering the history of the operations of the Booth-Kelly Company, which was the first operator in the field, and which is to-day the largest producer of lumber in that region. In 1897 Mr. Booth was running a mill in the southern part of Oregon for the cutting of pine, which is used mainly for sash and doors and cabinet purposes. An opportunity presented itself to lease a mill which had just been constructed for the manufacture of fir, and the Southern Pacific Company applied to him stating that a determination had been reached to make this lower rate and asking him to lease this mill. At that time the merchantability of Oregon fir in competition with Puget Sound fir and other lumber had not been demonstrated, but Mr. Booth, believing that the experiment was worth trying, leased this mill for a year, and the railroad company put in a rate of $3.10 per ton. An actual test showed Mr. Booth that this lumber would sell in competition with other fir in the San Francisco market, and also convinced him that he could profitably manufacture upon the rate proposed. He therefore entered into negotiations with the Southern Pacific Company for the purchase of a tract of timber land embracing about 17,000 acres. In order to reach this land, it was necessary to construct a railroad some 20 miles in length, which the Southern Pacific undertook to do upon condition that Mr. Booth should ship over the road, for the first year, a certain number of car loads of lumber, that he should pay an arbitrary rate of so much per ton over this branch road, and that he should take off the lumber from the tract in question within a given time.

"Mr. Booth testified—and there can be no doubt of the fact—that previous to the making of this contract, and as the basis of all his operations, it was understood between him and the railroad company that a rate to San Francisco should be put in and maintained which was fairly equivalent to the water rate from Portland, and that he should also be given a rate via Sacramento to various eastern points in Idaho, Utah, and Colorado. In accordance with this understanding the Southern Pacific established in 1899 a rate of $3.10 per ton upon lumber to San Francisco and bay points. This original rate applied to all kinds of lumber both green and dry. At first it was only applicable to the section in which the Booth mills were located, but was very soon extended to the entire Willamette Valley, including Portland. Under the stimulus of this rate the lumber business in the Willamette Valley rapidly developed. The Booth-Kelly Company extended its own operations, and many other mills sprang up, until, in 1904, that industry had reached very considerable proportions.

"In the latter part of 1903 the $3.10 rate was withdrawn from Portland, and in January, 1904, it was withdrawn from the entire Willamette Valley, a rate of $5 being established instead. The testimony in this case shows that the effect of the putting in of the $5 rate was, or would have been if continued, to practically suspend the operations of these mills. They made this representation with great earnestness to the Southern Pacific Company, and finally the leading officials of that company, among others its chief traffic director, visited the scene of these operations. As a result of this personal inspection, and after further consideration, that company announced that while the rate never ought to have been made at the outset, inasmuch as it had been, that company would continue it for the future, but would limit it to rough lumber shipped green. Acting upon this announcement, the Southern Pacific Company did, in May, 1904, make effective once again this rate of $3.10, which was now, however, applied not to all lumber, but only to rough green fir lumber and lath.

"As showing the importance which lumber manufacturers in this region attached to the $3.10 rate, what occurred at the time this rate was withdrawn in 1904 in a particular instance may be mentioned. A certain operator who owned one mill already had arranged, in the year 1903, to purchase a

considerable quantity of timber and to erect a large mill. When rumors of the withdrawal of the $3.10 became rife he suspended his negotiations, but after the rate was re-established in 1904, believing from what the officials of the Southern Pacific had said to him that this company had now finally determined upon the maintenance of this rate as a permanent policy, he purchased his land and resumed the building of his mill, and has since constructed still another mill, and purchased some 800,000,000 feet of timber. There can be no question but what the existence of this industry in anything like its present proportions in the Willamette Valley is almost entirely due to the establishment of this $3.10 rate. Without it the mills would not have been built nor the timber which these operators own purchased, nor could the business have been profitably conducted during recent years upon the present rate of $5 per ton. The complainants insist that a maintenance of the present rate will shut up their mills and very largely depreciate their timber investments.

"There are some 250 mills in the Willamette Valley, not including Portland, with a capacity of perhaps 1,300,000,000 feet per annum, although the actual cut of these mills has never exceeded in any one year 1,000,000,000 feet, of which about two-thirds is shipped out by rail over the lines of the defendants, the balance being consumed locally. A considerable part of this so-called local consumption is purchased by the railroad itself for its own use. The Booth-Kelly Company manufacture nearly one-seventh of the entire output of the valley, and there are two or three other large operators, but the great majority of these mills are small, with a capacity of from 10,000 to 20,000 feet in 10 hours. Green fir lumber weighs about 3,800 pounds to the 1,000 feet, and therefore an advance of $1.90 per ton would be equivalent to $3.13½ per 1,000 feet. The profit in manufacturing lumber in the Willamette Valley during the last seven or eight years has probably ranged from $1.50 to $2.50 per 1,000. These profits have often been greater and often less, but the above are perhaps the fair average limits. Most operators in this section own their own timber, but stumpage is frequently bought, and has ranged from 25 cents to $1 per 1,000. In arriving at the above profit stumpage is always charged as a cost of production. The Booth-Kelly Company charges itself for stumpage 50 cents per 1,000, although under the price at which that company bought its land the actual cost would be somewhat less. If the cost of stumpage should be eliminated, the profits would be increased by 50 cents per 1,000 feet. It will be seen, therefore, that this advance in the freight rate exceeds by considerable the average profit of manufacture in the Willamette Valley plus the price of stumpage. This lumber competes with that produced at Portland and shipped from Portland by water to San Francisco. It was not denied that in the past Portland lumber had successfully met lumber from the Willamette Valley in San Francisco upon the former rates of transportation. The rate from the Willamette Valley is now increased by more than the profit in the manufacture of this lumber. There can be but one result—lumber reaching San Francisco by water must supplant that from the Willamette Valley in the San Francisco market. The rate of $3.10 was intended to meet the water rate from Portland, and applied only at San Francisco and other bay points which could be reached by water. Lumber from Portland to an interior destination must be loaded upon the cars at the water line and transported by rail to the interior point. Lumber from the Willamette Valley to the same interior point was charged the $3.10 rate to San Francisco plus the local rail rate from San Francisco to destination, thus maintaining the competitive equality between Portland and the Willamette. It will be seen, therefore, that the $3.10 rate gradually increased as the distance from San Francisco Bay increased, until the $5 limit was reached. The present rate of $5 applies to all the territory which could formerly be reached at $5 and less. Hence the advance to points distant from San Francisco Bay is less than $1.90 per ton by a gradually diminishing amount until it reaches the old $5 limit.

"It will also be remembered that the Willamette Valley now has an outlet to eastern destinations via Portland. When this original rate was established, there could be no movement through the Portland gateway, and a rate was made to eastern destinations via Sacramento. The movement to

the south over the Siskiyou and afterwards to the east over the Sierra Nevada was extremely expensive, and when the Southern Pacific and the Union Pacific became united in 1901 joint rates were established for the movement of this lumber through Portland over the Union Pacific lines, where the grades were much easier and the cost of operation much less. These mills therefore reach to-day via Portland the same eastern destinations which they formerly reached via Sacramento. These rates from the Willamette Valley to various eastern points are the same as from Portland, as a rule, and usually the same as from mills in Washington upon the west of the Cascades. Those rates have also been advanced, and proceedings are pending before the Commission for a restoration of the original rates, but the questions involved are entirely distinct from this. The defendant apparently concedes that whatever rate is established to eastern points from Portland should also be conceded these Willamette Valley mills.

"It follows, therefore, that the effect of this advance is to shut up, as to the Willamette Valley, the San Francisco market, and to limit the market in the vicinity of San Francisco. All other markets are open to these mills to exactly the same degree that they have been in the past. What, then, is the effect of withdrawing that particular market? The timber cut at these Willamette mills is known as Oregon fir, and is very similar to Washington fir except that the trees are smaller. The testimony fairly shows that grade for grade the lumber sells at the same price with Washington fir and with the same readiness. It would seem, however, that the percentage of high-grade lumber runs somewhat less with these mills than in Washington, and, still further, that the poorer grades are not as good here as in Washington.

"The testimony showed that this poorer lumber could not be shipped to eastern markets, and that the only market in which it could be disposed of was San Francisco and points in that immediate vicinity, and this seems probable, for there are few eastern points which can be reached at less than a 40 cent rate, and it fairly appears in this case that there are to-day few if any markets to which No. 2 lumber can be shipped upon a rate as high as that. As was very truly said by counsel for the defense in the argument of the Eastern Rate Cases 'the common board is everywhere,' and the Pacific Coast manufacturer cannot expect to send to the east this grade of his product. These lower grades must be disposed of in comparatively nearby markets. Mills upon the coast can market this lumber by water, interior mills in Washington seem to find a considerable local market, and the same is true of Portland, but these operations in the Willamette Valley have no local market of any account, and have relied in the past upon the San Francisco market for the disposing of this part of their output. To deprive them of this market, or to require them to take $3.13 per 1,000 feet less for this part of their product, which is a considerable percentage of the whole, would turn a profitable into an unprofitable business.

"It appears probable, too, that the effect of withdrawing this market will be more serious upon the small mill than upon the two or three large operators who are affected by these rates. In order to ship lumber long distances it must frequently be dressed and kiln-dried. The larger mills have facilities for doing this, but the smaller operators are without such facilities; nor can they afford to provide them. They must sell their lumber in the rough, and they do sell a very considerable portion of it in this market.

"It appeared from figures furnished by the defendants that, during the year 1907, 7,108 cars of lumber moved from the Willamette Valley via Portland, and that 5,436 cars of commercial lumber moved south through Ashland. There was a further movement through Ashland of 3,326 cars of company lumber. The relative movement south was much less during this year than at any previous period, for the reason that the defendants were unable to furnish cars for the transportation of lumber in that direction. Of the cars moving south about one-half were to San Francisco and other bay points, and a large proportion of the remainder were to points affected by the advance; although it should be remembered that a portion of this southern movement was dry lumber to which the $5 rate only applied. Mr. Booth testified that about 20 per cent. of this lumber moved south under the $3.10

rate, and that the permanent withdrawal of this rate would practically shut down the operations of his company."

While it will be seen from the foregoing quotation from the report of the Commission that that body took into consideration the conduct of the railroad company under which the lumbermen undertook and developed the lumber industry in the Willamette Valley, the Commission, in fixing as it did the rate of $3.40 on rough green fir lumber and laths for the haul in question, by no means limited the basis of its decision to the past action of the railroad companies, as will be seen from this further quotation from its findings and decision:

"The distance from Portland to San Francisco is about 750 miles. This rate of $3.10 applied from mills just south of Portland as a blanket rate over about 250 miles up the Willamette Valley, the average distance over which lumber moved upon it being perhaps 625 miles. Upon this assumption the rate would yield about 5 mills per ton mile. All this lumber in reaching San Francisco must be hauled over the Siskiyou Mountains, where grades are extremely heavy, and the cost of operation unusually high. Taking the whole 750 miles, the grade does not exceed one-half of 1 per cent. for 500 miles, and operating conditions over this portion of the line are favorable; but for about 250 miles grades and curvatures are severe. The steepest grade is found just after leaving Ashland for the south, where for 36 miles the heaviest engine can only haul 375 gross tons. Over the entire 250 miles 500 tons would be an average load for such a locomotive. In practical operation it seems to be customary to make up trains at Ashland of from 20 to 25 cars and to send these trains over the mountains solid. Such a train requires for the first 36 miles out of Ashland three of these most powerful engines, but for the balance of the way can be handled by two. The fuel used is oil, which costs, reduced to the price of coal, $2.80 per ton. Mills in the Willamette Valley are not situated near the river, and are not therefore as a rule upon the main line of the defendants, but are reached by short branch lines of different lengths. The service of collecting this lumber and putting it into the trains of the defendant upon its main line is therefore a somewhat expensive one.

"The present rate of $5 per ton is equivalent to 25 cents per 100 pounds, and the defendants insist that this rate, tested by a comparison with lumber rates in different parts of the United States, taking into account the operating conditions which obtain here, cannot be regarded as extravagant. Comparisons with other lumber rates are not conclusive nor greatly profitable, since operating conditions are seldom the same, much less traffic and commercial conditions. The old rate of $3.10 paid, as above stated, an average return of about 5 mills per ton mile. There are many instances within the knowledge of the Commission where lumber has been and is now being transported for a less charge than this. The $3.10 rate was certainly a low one, but we are satisfied that it did yield when established, has ever since yielded, and would for the future yield, a substantial return over and above the cost of operation, and that its maintenance in the past has contributed much to the prosperity of the defendants.

"In 1898 no lumber moved from the Willamette Valley. In 1907 the defendants handled from these mills more than 12,000 car loads of revenue paying lumber. This development of the lumber industry has not only directly contributed a large amount of traffic, but has developed the entire country, and has thus added indirectly as much or perhaps even more to the net profits of the defendants. It is not susceptible of doubt that this development would not have taken place at the time it did, but for the putting in of the $3.10 rate, as previously stated. The railroad from the southern line of Oregon north is owned by the Oregon & California Railroad Company, but these lines have been operated since before 1898 under lease by the Southern Pacific Company, which now also owns the capital stock of the Oregon & California Company. The Southern Pacific Company in its returns to this Commission does not state separately the result of operations upon

the lines of the Oregon & California Company, and we have nothing in this case from which we can make a critical examination of the results of those operations through a series of years. It does appear that in the year 1897 the gross earnings from operation upon these lines were $1,436,037, and operating expenses $1,112,835, leaving net earnings of $323,202, and that the same figures for 1907, were: Gross earnings, $6,417,153: operating expenses, $4,766,350; net earnings, $1,650,803. The mileage in 1897 was 654 miles, in 1907, 665 miles, of which about 300 miles are main line and the balance branches. It appears, therefore, that net earnings in 1907 were more than gross earnings had been 10 years before, and that present net earnings are about $2,500 per mile. When it is remembered that more than half of this mileage consists of branch lines, not expensive to construct, it would appear the above returns are fairly compensatory.

"The above figures abundantly confirm the judgment of Mr. Huntington that a rate should be made which would develop the lumber industry of this region, and in our opinion the maintenance of this $3.10 rate would be also for the advantage of the defendants in the immediate future. These mills are established, and they will continue to do business upon a margin of profit much smaller than would have been sufficient to induce their construction in the beginning. But it has been seen that their only market for poorer grades of common lumber is to the south, and that without a market for this class of lumber they cannot successfully compete with other mills upon the Pacific Coast. As already suggested, when the price of stumpage has sufficiently increased in other sections, this lumber in the Willamette Valley can be manufactured at a profit upon the $5 rate, but for the present it seems highly probable that the continuance of the lower rate is necessary to a continuance of the business itself in anything like its present volume."

It will be seen from the last quotation from the findings of the Commission and from other parts of it that it expressly found that the old rate of $3.10 established by the railroad company paid an average return to it of about 5 mills per ton mile, and that while that rate was a low one "it did yield when established, has ever since yielded, and would for the future yield, a substantial return over and above the cost of operation." In view of that finding, we cannot say that its increased rate to $3.40 a ton is so unreasonable as to come within any inhibition of the Constitution of the United States. The jurisdiction which is invoked here ought, as was said by the Supreme Court of the United States in a recent and analogous case, to be exercised only in the clearest cases. The case referred to is a water rate case (Knoxville v. Water Company, 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371), where the court said, among other things:

"If a company of this kind chooses to decline to observe an ordinance of this nature, and prefers rather to go into court with the claim that the ordinance is unconstitutional, it must be prepared to show to the satisfaction of the court that the ordinance would necessarily be so confiscatory in its effect as to violate the Constitution of the United States. In Ex parte Young, 209 U. S. 123, 166, 28 Sup. Ct. 441, 456 (52 L. Ed. 714, 13 L. R. A. [N. S.] 932), the last word of caution by this court was said: 'Finally it is objected that the necessary result of upholding this suit in the Circuit Court will be to draw to the lower federal courts a great flood of litigation of this character, where one federal judge would have it in his power to enjoin proceedings by state officials to enforce the legislative acts of the state, either by criminal or civil actions. To this it may be answered, in the first place, that no injunction ought to be granted unless in a case reasonably free from doubt. We think such rule is, and will be, followed by all the judges of the federal courts.' The same thought, in effect, was expressed in San Diego Land & Town Company v. National City, 174 U. S. 739, 754, 19 Sup. Ct. 804,

810 (43 L. Ed. 1154): 'Judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use.' And in San Diego Land & Town Company v. Jasper, 189 U. S. 439, 441, 23 Sup. Ct. 571, 572 (47 L. Ed. 892), after repeating with approval this language, it was said: 'In a case like this we do not feel bound to re-examine and weigh all the evidence, although we have done so, or to proceed according to our independent opinion as to what were proper rates. It is enough if we cannot say that it was impossible for a fair-minded board to come to the result which was reached.' "

And the Supreme Court, in Knoxville v. Water Company, concluded its opinion in these timely and appropriate words:

"The courts, in clear cases, ought not to hesitate to arrest the operation of a confiscatory law, but they ought to refrain from interfering in cases of any other kind. Regulation of public service corporations, which perform their duties under conditions of necessary monopoly, will occur with greater and greater frequency as time goes on. It is a delicate and dangerous function, and ought to be exercised with a keen sense of justice on the part of the regulating body, met by a frank disclosure on the part of the company to be regulated. The courts ought not to bear the whole burden of saving property from confiscation, though they will not be found wanting where the proof is clear. The Legislatures and subordinate bodies, to whom the legislative power has been delegated, ought to do their part. Our social system rests largely upon the sanctity of private property, and that state or community which seeks to invade it will soon discover the error in the disaster which follows. The slight gain to the consumer, which he would obtain from a reduction in the rates charged by public service corporations, is as nothing compared with his share in the ruin which would be brought about by denying to private property its just reward, thus unsettling values and destroying confidence. On the other hand, the companies to be regulated will find it to their lasting interest to furnish freely the information upon which a just regulation can be based."

The conclusion to which we have come in the case before us is that the complaint should be dismissed at the complainants' cost. It is so ordered.