ANCHOR COAL CO. et al. v. UNITED STATES et al. (INTERSTATE COMMERCE COMMISSION et al., Interveners).

District Court, S. D. West Virginia. April 14, 1928.

1. Commerce ⊜⇒96—Special court, in suit to enjoin enforcement of order of Interstate Commerce Commission, must ascertain exactly what was done.

Special court of three judges, convened pursuant to statute to hear case seeking to enjoin enforcement of order of Interstate Commerce Commission directing carriers to cancel certain rate schedules, has duty of going behind merely formal conclusions of Commission that rates were reasonable or unreasonable, and of ascertaining exactly what was done, and on what facts and on application of what principles Commission arrived at its conclusions.

2. Commerce ⊜⇒91—Courts will not weigh evidence, nor consider wisdom of action of Interstate Commerce Commission supported by evidence, unless there is irregularity or error of law.

Where determination of Interstate Commerce Commission finds substantial support in evidence, the courts will not weigh evidence, nor consider wisdom of Commission's action, which within scope of its jurisdiction is conclusive, unless there be some irregularity in proceeding, or some error in application of rules of law.

3. Commerce ⊜⇒91—Courts are not bound by action of Interstate Commerce Commission in making order under erroneous theory of law.

Where Interstate Commerce Commission, in making order relative to rates, has exceeded its powers or has proceeded on erroneous theory of law, or if action is so manifestly arbitrary or unreasonable as virtually to transcend the

authority conferred on it, the courts are not bound by its action.

4. Commerce ⊜⇒85(6)—Interstate Commerce Commission exceeded powers in ordering cancellation of schedules reducing rates, in effort to equal industrial conditions or offset economic advantages.

The Interstate Commerce Commission, in making an order canceling certain rate schedules filed by carriers, reducing freight rate on lake cargo coal from southern territory, held, to have exceeded its powers in that its action was based in part, at least, on industrial conditions, and constituted an effort to equalize industrial conditions, or offset economic advantages, through adjustment of rates.

5. Commerce ⊜⇒85(5)—Interstate Commerce Commission may prescribe minimum rates, to prevent rate wars and guarantee reasonable earnings (Transportation Act 1920 [49 USCA § 71 et seq.]).

Interstate Commerce Commission has the right, under Transportation Act of 1920 (49 USCA § 71 et seq.; Comp. St. § 10071¼ et seq.), to prescribe minimum rates, to prevent ruinous rate wars and guarantee reasonable earnings, not only to carriers affected, but also competing carriers, who labor under a higher cost of doing business, and is not limited in prescribing minimum rates to cases where rates proposed are unreasonable per se, or so low as to cast a burden on other traffic.

6. Commerce ⊜⇒91—Courts will not interfere with action of Interstate Commerce Commission fixing rates, or prescribing minimum in exercise of its powers.

Where Interstate Commerce Commission fixes a rate and prescribes a minimum in the exercise of powers conferred on it, the courts will not interfere with its action, however much they may disagree with its reasoning.

7. Commerce ⊜⇒85(6)—Resolution authorizing Interstate Commerce Commission to consider conditions in several industries did not justify their considering industrial conditions as reason for widening differential in rates (HochSmith Resolution [49 USCA § 55; Comp. St. § 8583aa]).

Hoch-Smith Resolution (49 USCA § 55; Comp. St. § 8583aa), authorizing Interstate Commerce Commission to consider conditions prevailing in several industries, to the end that commodities may freely move, held, not to justify Commission in considering industrial conditions and shift in traffic as a reason for widening differential between rates on lake cargo coal from different territory; the resolution only authorizing relief against rates found to be unjustly discriminatory, or unduly preferential, thereby imposing undue burdens, or giving undue advantages.

8. Commerce ⊜⇒87—Interstate Commerce Commission erroneously required carrier to justify proposed reduction of freight rate on lake cargo coal (49 USCA §§ 1 (4), 15(7).

The Interstate Commerce Commission, in proceeding to cancel certain rate schedules, reducing freight rate on lake cargo coal from southern territory to lake ports, proceeded on an erroneous theory of law in holding that bur-

den was on southern carriers to justify the proposed reduction by a comparison of reduced rates with lower maximum rates prescribed for a competing field; carriers having the right under 49 USCA § 1(4), Comp. St. § 8563(4), to initiate rates, and burden on carrier to justify increased rate on a hearing under section 15(7), 49 USCA § 15(7), Comp. St. § 8583(7), not applying to rate reduction.

**9. Commerce ⚫══91—Error as to burden of proof is not ground requiring court to interfere with action of Interstate Commerce Commission.**

Error of Interstate Commerce Commission as to burden of proof, in the sense of duty to go forward with the evidence or to produce the preponderance thereof, does not constitute ground for court to interfere with action of Commission, as courts will not attempt to control matters of procedure therein.

**10. Commerce ⚫══87—Interstate Commerce Commission erroneously required carrier to assume burden of justifying proposed reduction of rates on lake cargo coal (Interstate Commerce Act, § 15a(2), as added by Transportation Act 1920, § 422, 49 USCA § 15a(2).**

Interstate Commerce Commission, in proceeding to cancel certain rate schedules reducing freight rate on lake cargo coal from southern territory, proceeded on erroneous theory of law in holding that burden was on carrier to justify the proposed reduction of rates under section 15(a)(2) of Interstate Commerce Act, as added by section 422 of Transportation Act 1920 (49 USCA § 15a(2); Comp. St. § 8583a(2).

**11. Commerce ⚫══92—Special court had jurisdiction of suit by coal producers affected by rate schedules to enjoin order canceling schedules reducing freight rates (28 USCA §§ 46, 47).**

Under 28 USCA §§ 46, 47, special court of three judges, convened pursuant to statute to hear case seeking to enjoin enforcement of order of Interstate Commerce Commission canceling certain rate schedules and reducing freight rate on lake cargo coal, *held,* to have jurisdiction of such suit instituted by coal producers vitally affected by the rates, and some of whom were heard before the Commission by intervening in proceeding in which order was entered.

**12. Commerce ⚫══92—Suit to enjoin cancellation of schedule reducing freight rates held properly brought in district wherein parties vitally affected resided (28 USCA § 43).**

Under 28 USCA § 43, venue of suit to enjoin order of Interstate Commerce Commission canceling schedule reducing rates on lake cargo coal from southern territory, *held* properly laid in district in which some of the coal producers vitally affected by the rates, and parties to original proceeding by intervention, resided.

In Equity. Suit by the Anchor Coal Company and others against the United States and others, wherein the Interstate Commerce Commission and others intervened. Decree for plaintiffs.

John W. Davis, of New York City, R. E. Quirk, of Washington, D. C., E. L. Greever, of Tazewell, Va., and J. V. Norman, of Louisville, Ky., for complainants.

Blackburn Esterline, Asst. Sol. Gen., of Washington, D. C., for the United States.

P. J. Farrell and Daniel W. Knowlton, both of Washington, D. C., for intervener Interstate Commerce Commission.

Herbert Fitzpatrick, of Huntington, W. Va., Theodore W. Reath, of Philadelphia, Pa., William A. Northcutt, of Louisville, Ky., and W. S. Bronson, D. Lynch Younger, and Charles J. Rixey, Jr., all of Washington, D. C., for defendants railway companies.

August G. Gutheim, of Washington, D. C., George Poffenbarger, of Charleston, W. Va., Ernest S. Ballard and Frank E. Harkness, both of Chicago, Ill., A. M. Belcher, of Charleston, W. Va., F. M. Livezey, of Huntington, W. Va., Howard B. Lee, of Charleston, W. Va., Andrew P. Martin, of Cleveland, Ohio, Harry I. Allen, of Chicago, Ill., Charles E. Elmquist, of St. Paul, Minn., Squire, Sanders & Dempsey and C. F. Taplin, all of Cleveland, Ohio, Leslie F. Laylin, of Columbus, Ohio, Charles R. Webber, of Baltimore, Md., W. N. King, of Cleveland, Ohio, James Stillwell, Guernsey Orcutt, and Alfred S. Knowlton, all of Pittsburgh, Pa., for sundry interveners.

Before PARKER and NORTHCOTT, Circuit Judges, and McCLINTIC, District Judge.

PARKER, Circuit Judge. This suit was brought by coal producers engaged in mining and shipping coal from southern West Virginia, western Virginia, eastern Tennessee, and eastern Kentucky, against the United States and a number of railroad companies engaged in the transportation of coal from that territory to ports on Lake Erie. Its purpose is to enjoin the enforcement of an order of the Interstate Commerce Commission, entered February 21, 1928, which directs that the carriers cancel certain rate schedules which they have filed, reducing by 20 cents per ton the freight rate on "lake cargo" coal from the territory named to the lake ports. A special court of three judges has been convened pursuant to statute to hear the case, intervention has been allowed on the part of various interested parties, and it has been agreed that the court shall determine finally the rights of the parties with respect to the relief prayed, instead of hearing only the application for an interlocutory injunction.

The controversy before us, as already indicated, has relation to "lake cargo" coal, a term used to designate coal shipped to ports of the Great Lakes for transshipment

by vessel to various lake and river ports in the United States and Canada, whence it is distributed by rail. The rates on such coal are in the nature of proportional rates to the lake ports for part of a through movement to across-lake destinations. The coal is transported across the lakes only during the months from April to November; and, as this movement occurs during the summer months, when the coal trade is slack, it is of great importance to the mine operators, since it enables them to keep their mines in operation during the dull season. All of the lake cargo coals are more or less competitive, particularly for steam and domestic purposes; and those produced in the Pittsburgh district are highly competitive with those produced in the territory of complainants, so much so that a difference in price of a few cents will determine a sale. Pittsburgh Coal Producers' Ass'n v. Ashland Coal & Iron R. Co., 126 I. C. C. 344, 345. The importance of the trade to the producers may be judged from the fact that in 1925 the volume of the across-lake movement was 26,333,000 tons. In 1923 it was 29,840,000 tons. Its importance to complainants is shown by the fact that in 1925 they furnished practically 82 per cent. of this tonnage (126 I. C. C. 362), and that in 1924 it constituted 12.6 per cent. of their total production (126 I. C. C. 354).

As ability to compete in the sale of lake cargo coal depends in large measure upon the freight rate applied to shipments to the Lake Erie ports, there has been a long history of controversy over these rates. This controversy has been carried on by the operators in the coal producing region around Pittsburgh, Pa., which we shall refer to generally as the northern field, and by those operating in territory of complainants, which we shall refer to as the southern field. The haul from the southern field to the lake ports is considerably longer than that from the northern field (see map, 101 I. C. C. 516), and the rate has always been higher than from the northern field. The difference in rate, however, has never been so great as the difference in distance, due in part to the fact that the carriers from the southern field, being especially well equipped for carrying coal, could transport it at a lower cost, distance considered, than those serving the northern field, and in part to the necessity of fixing a low rate if they were to get any coal to haul. A rate based on anything like a mileage basis would have excluded the southern coal from the lake cargo market. These rates were fixed originally under competitive conditions, and, until the supervisory power of the Interstate Com-

merce Commission was invoked, the differential between them was very small, only 9 cents per ton between the Pittsburgh and Kanawha districts; the rate being 88 cents per ton from Pittsburgh and 97 cents from Kanawha.

In 1912, for the first time, the Commission took a hand in the fixing of the rates. In that year it denied the petition of the Chesapeake & Ohio that it be allowed to increase its rates from the southern field, 22 I. C. C. 604; and reduced by 10 cents the rates from the northern field, Boileau v. Pittsburg & Lake Erie R. Co., 22 I. C. C. 640, and Pittsburg Vein Operators' Ass'n v. Pa. Co., 24 I. C. C. 280. The effect of this was to spread the differential from 9 to 19 cents as between the two fields. In subsequent rate adjustments the differential was further increased to 25 cents, which was preserved in the various changes by which the rates were increased until those from the Pittsburgh district were $1.66 per ton and those from the Kanawha district were $1.91 per ton. This was the differential between the rates from the northern and southern fields at the time of the passage of the Transportation Act of 1920, and it was continued as the differential until the order of the Commission of May 9, 1927, which increased it to 45 cents per ton. If the proposed rates by the carriers from the southern field are allowed to go into effect, the reduction of 20 cents per ton will reduce the differential to 25 cents again. The question before us, therefore, is whether we shall enjoin the Commission from preventing a reduction of rates the effect of which will be to restore the old differential, which the Commission itself established.

[1] The orders of the Commission, by which the differential between the northern and southern fields was increased from 25 to 45 cents, and by which the southern carriers were ordered to cancel schedules which would not only reduce rates, but would also restore the old differential of 25 cents, afford an interesting study, and present a question fraught, we think, with the gravest consequences to the future of the country, if the power asserted by the Commission can be sustained. To understand, however, exactly what the power is which the Commission has assumed to exercise, it is necessary that we go behind its merely formal conclusions that rates are reasonable or unreasonable, and ascertain exactly what it is that it has done, and upon what facts and upon the application of what principles it has arrived at its conclusions. This it is our duty to do. Southern Pacific Co. v. Interstate

Commerce Commission, 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283; U. S. v. N. Y. Central Railroad, 263 U. S. 603, 44 S. Ct. 212, 68 L. Ed. 470. And, in the performance of this duty, it is necessary that we analyze not only the report of the Commission accompanying the order whose enforcement we are asked to enjoin, but also the reports made in 1925 and 1927 with regard to the reductions of rates from the northern field, in the latter of which the differential between the two fields was increased from 25 to 45 cents.

In the case from the northern field, the first decision in which was rendered July 16, 1925 (Lake Cargo Coal Rates 1925, 101 I. C. C. 513), coal producers of the northern field had filed petitions alleging that the rates charged them on lake cargo coal were unjust and unreasonable per se, relatively unreasonable, and unduly prejudicial as compared with rates on this traffic from all other districts in the Appalachian region, and that the rates from other districts were unduly preferential, the other districts referred to being particularly the districts which we have referred to as the southern field. An extended hearing was had and the petitions were denied. The Commission summed up its conclusion in the last paragraph of its report as follows (101 I. C. C. 548):

"After full consideration and upon the entire record, we find that the present rates on lake cargo coal from the Pittsburgh, Ohio No. 8, Cambridge, and Fairmont districts do not exceed the maximum of reasonableness and are just and reasonable rates, *and that the rates assailed on lake cargo coal from these and other districts are not unduly prejudicial, unduly preferential, or otherwise unlawful.*" (Italics ours.)

An examination of the report will show that the Commission compared the ton mile earnings of the carriers from the northern and southern fields (101 I. C. C. 522); compared the lake cargo rates with the local rates on coal (523) and with the rates on commercial coal (547); compared various differentials with the differentials involved and with the increased haul for which the differentials were imposed (524 to 525); considered the movement of ore in the cars returning to the northern field (526); considered transportation characteristics of the various hauls (527 to 529); considered costs of transportation from the various districts, computed according to various theories (529 to 531); compared lake cargo rates charged by carriers from southern fields with rates charged by them on coal to tidewater (537); considered the rate relationship of the

25 F.(2d)—30

northern and southern fields and how their competition was affected by the rates (540, 542); and fully discussed the relation of these various matters to the rates involved. On the contention that the existing rate adjustment was prejudicial to the carriers from the northern field, the Commission said (101 I. C. C. 545):

"It is apparent that the carriers controlling the rate adjustment from the southern West Virginia and Kentucky districts are not the same as those which control the adjustment from the complaining districts. The basis for a finding of undue prejudice is thus lacking, even if the facts adduced to support such a finding would in other respects support it, as they do not."

After thus disposing of the contention as to prejudice, the Commission proceeded to refuse to prescribe minimum rates for the carriers from the southern field as follows (101 I. C. C. 545, 546):

"Realizing this, complainants invoke our power to prescribe minimum rates. In Sugar Cases of 1922, 81 I. C. C. 448, 472, we said: 'No doubt the power to fix such minimum rates can in some situations be employed to advantage and with propriety, for the purpose of averting rate wars, which are always injurious to the carriers and ordinarily, in the long run, to the public interest, or for the purpose of preventing an unjust burden upon other forms of traffic or upon other parts of the country. We believe, however, that this power should be sparingly exercised and only in cases where it clearly appears that its exercise is necessary in order that substantial public injury may be avoided.'

"No rate war is imminent. Allegations in the Ohio complaints that rates from the southern districts were unduly low were withdrawn at the hearing. Regulatory commissions of the states where most of this coal is consumed contend vigorously and earnestly that grave public injury would be caused by a widening of these differentials, and that the public interest would be promoted by narrowing them. In no proceeding before us have consumers and their representatives insisted more earnestly and forcibly than they have here that their interests be not submerged in the struggle between competing coal districts.

"In Galloway Coal Co. v. A. G. S. R. R. Co., 40 I. C. C. 311, we said: 'Consumers may properly have the widest possible markets consistent with justice to the carriers, and to that end and also in their own interests carriers may, within reasonable limits, as a matter of traffic policy, accord competing

producing centers located at different distances from common centers of consumption identical rates.'

"And in Andy's Ridge Coal Co. v. Southern Ry. Co., 18 I. C. C. 405, we said: 'Differentials between competing coal mines to various markets of consumption cannot be established upon distance alone; nor can one case be safely made the precedent for another. Much depends upon competitive conditions, and each situation must be considered and disposed of by itself. * * * In determining these differentials we must consider the interest of the consumer as well as the producer. Rates should be so adjusted as to permit the widest possible competition. * * * Coal rates are usually highly competitive. * * * The differentials from these different mines are the outgrowth of years of experiment and ought not to be disturbed by us unless we are certain that justice requires it.'

"The differentials here are not only the result of years of experiment, but in fact are those prescribed by us. They have not been shown to result in undue prejudice to the complainants."

After this decision was rendered the petitioners from the northern field asked for a rehearing, which was granted, and on May 9, 1927, an order was entered, concurred in by a majority of the Commission, reducing the rates on lake cargo coal from the northern field 20 cents per ton, and thereby widening the differential between the northern and southern field to 45 cents. The report which accompanied the order, while going into a comparison of the lake cargo rates from the northern field with local rates on coal and other commodities, went at great length into a comparison of the rates between the northern and southern fields and the shift in the lake cargo tonnage to the southern field. At the end of its long report, the Commission summarizes its conclusions (126 I. C. C. 360 to 365), from which we think it is apparent that the reduction in rate was allowed because of the holding that the rates from the northern field were "relatively" higher than those from the southern field (i. e., as compared with length of haul), although actually lower; that the shift of tonnage to the southern field, although due to the higher cost of producing and marketing coal in the northern field, justified the lowering of the rates to the northern field; and that it was the duty of the Commission to give consideration to such conditions in the industry because of the provisions of the Hoch-Smith resolution. After calling attention to the fact that further study had convinced the Commission that lake cargo coal was entitled to lower rates than commercial coal, the report proceeds (126 I. C. C. 361 to 364):

"Upon the more complete record now before us, we are of the opinion that the rates on the same class of traffic from other districts in the same region shipping a large amount of lake cargo coal are entitled to more weight in passing upon the reasonableness of the rates assailed than any other rate comparisons, although we take into consideration that such rates from the southern districts may not be reasonable maxima in all instances. In reaching our original decision, there was no doubt in the minds of at least some of those constituting the majority that the rates from the Pittsburgh and Ohio districts were relatively much higher than those from the southern districts; but, as stated, the majority did not then regard the rates assailed as unreasonable largely because of the comparisons with rates on commercial coal, the record did not justify the prescribing of minimum rates from the southern districts, and no undue prejudice or preference could be found because the rates from the complaining districts and from the southern districts were controlled by different carriers.

"The record on further hearing differs materially from the original record in respect to the trend of the movement of lake cargo coal from the various districts. In our original report we pointed out that in 1923 Ohio No. 8 shipped more lake cargo coal than all the Kentucky districts combined, but on further hearing it is shown that in 1924 Ohio No. 8 shipped 663,000 tons less than Kentucky, and in 1925, Kentucky shipped 5,291,000 tons more than Ohio No. 8, or about four times as much as the latter. Likewise, we pointed out that the rate of increase in the tonnage shipped from Ohio No. 8 and Cambridge up to 1923 was much greater than for southern West Virginia, but it is now shown that the combined tonnage from the two Ohio districts declined in 1924 and for 1925 was less than one-third that in 1923, while the tonnage from southern West Virginia increased in 1924 and for 1925 was nearly double that in 1923. Ohio No. 8 and Cambridge shipped more than one-half as many tons as southern West Virginia in 1923, but in 1925 southern West Virginia shipped ten times as much as the two Ohio districts. The tonnage shipped from the Pittsburgh district has continued to fall off since the original hearings but at a much more rapid rate, that for 1924 being less than one-half of 1923 and for 1925 less than one-third of 1923. In our

original report we stated that of the total lake cargo tonnage of high-volatile coal in 1923, Pennsylvania and Ohio districts taking rates of $1.66 or less shipped 60.4 per cent., while all of West Virginia and Kentucky shipped 39.6 per cent. In contrast to those figures, it now appears that in 1925 all of Ohio and Pennsylvania shipped only about 18 per cent. of the total tonnage, while West Virginia and Kentucky shipped practically all of the remaining 82 per cent. This marked change in conditions is evidently due principally to the higher cost of producing and marketing coal in the Ohio and Pennsylvania districts. The higher cost is no doubt due to various causes, but it is apparent that the freight rates contribute to the cost of producing and marketing coal in the complaining districts, and as stated, those from the Pittsburgh and Ohio districts are relatively much higher than those from the southern districts.

"At the time of the original hearings the coal-mining industry in Ohio and Pennsylvania was in a comparatively prosperous condition. Since then 12,000 to 15,000 miners have left the Ohio mines, there has been a large increase in the number of vacant houses in the mining communities, and merchants have large amounts of unpaid accounts upon their books. In the Pittsburgh district miners have been given help in getting transportation to the southern fields; from 1921 to 1925 the number of employees engaged in coal mining decreased 20 per cent., while employees in other industries increased 40 per cent., and the coal business is in a depressed condition. It does not appear that all this is due solely to the rate adjustment, but if that adjustment is improper it is our duty to correct it so far as possible, *and we must give consideration to the conditions existing in the industry under the provisions of the Hoch-Smith Resolution.* * * *

"Briefly summarizing, in reaching our conclusions upon the question of reasonableness, we have taken into consideration the unusually favorable circumstances and conditions surrounding the movement of lake cargo coal, which make the rates thereon in a class by themselves; the relatively much lower rates from the southern districts, which the carriers serving those districts find profitable to maintain; *the very decided change in the relative tonnage of lake cargo coal shipped from the complaining Pittsburgh and Ohio districts and the southern districts, respectively; the present depressed condition of the coal-mining industry in the Pittsburgh and Ohio districts;* and the fact that the cost of

the service warrants a substantial reduction in the rates. *We have taken into consideration particularly the changed conditions since our previous decisions regarding these rates,* also to some extent the rates on ore from the ports to points in or near the complaining Pittsburgh and Ohio districts, and other evidence which need not be specifically referred to in the comprehensive record now before us." (Italics ours.)

As bearing upon the subsequent action of the Commission, the following extracts relating to the rates from the southern field and the question of the differential are significant (126 I. C. C. 365):

"We do not regard the present relationships between the rates from the complaining Pittsburgh-Ohio districts and the southern districts as proper, but the reductions required in the rates from the Pittsburgh and Ohio districts will go far toward removing the alleged undue prejudice to those districts, and following the principle of the Ashland Fire Brick Case, we adhere to our previous findings on the question of undue prejudice and preference. * * * Under the issues now presented, it is unnecessary for us to consider whether the rates from the southern districts are lower than reasonable minima, but we are of the opinion that the carriers would not be justified in reducing the present rates from those districts."

The reduced rates from the northern field were to become effective August 10, 1927. After the decision of the Commission fixing them was announced, the defendant carriers serving the southern field filed tariff schedules under the statute reducing their rates on lake cargo coal from the southern field 20 cents per ton and thereby restoring the old differential. The Commission at once suspended the operation of the schedules upon protests from certain of the operators in the northern field and ordered a hearing on the rates embraced therein. Upon this hearing certain of the complainants here intervened and opposed the cancellation of the schedules. On February 21, 1928, the Commission entered the order complained of directing that the schedules be canceled, and accompanying the order filed a report in which it set forth the grounds upon which it had proceeded. This report begins with a résumé of the decisions rendered on the petitions of the operators from the northern field, summing up the effect of these decisions as follows (Lake Cargo Coal Case, 139 I. C. C. 371):

"In the original report in that case, decided July 16, 1925, we found that the rates assailed did not exceed the maximum of reason-

ableness and were just and reasonable, and that those and the rates from the districts alleged to be preferred were not unduly prejudicial, unduly preferential, or otherwise unlawful, and dismissed the complaints. The evidence of the complaining Pittsburgh and Ohio districts in that case in respect of the issue of undue prejudice and preference was practically limited to the principal districts in southern West Virginia, eastern Kentucky, and Tennessee from which reduced rates are here proposed, referred to herein as the southern districts. As to that issue we stated at page 545 of our original report that many of the coal-carrying roads did not participate in the rates from both those complaining districts and the districts in southern West Virginia, eastern Kentucky, and Tennessee alleged to be preferred, and that a basis for a finding of undue prejudice was lacking even if the facts adduced to support such a finding would in other respects have sustained it, which they did not.

"In our report on further hearing, made May 9, 1927, *we adhered to our previous finding that there was no legal basis for a finding of undue prejudice and preference*, but found unreasonable the rates from the Pittsburgh district and from the Ohio No. 8 and Cambridge districts to the extent that they, respectively, exceeded $1.46 and $1.43. We said that we did not regard the relationships then existing between the rates from the complaining Pittsburgh-Ohio districts and the southern districts as proper, *and expressed the opinion that the carriers would not be justified in reducing the rates then, and now, in effect from the latter districts.*" (Italics ours.)

After adverting to the contention of the southern carriers that it was their right as well as their duty to stockholders and patrons to initiate rates with a view to meeting competitive conditions, and that in publishing rates they were exercising a managerial function which belonged to them, and to the contention of the southern operators that the reduced rates were necessary to insure to them their fair share of the lake cargo market, the Commission stated that it was not within its power to adjust rates to allow competing shippers to market their products and that although rates found lawful might have that effect, they must be based fundamentally upon conditions surrounding the transportation. It then considered the shift in tonnage of lake cargo coal to the southern field, and said that this shift appeared to have been due in large measure to lockouts, miners' strikes, and to higher cost of producing coal in the northern than in the southern field, and that

these conditions still prevailed. It stated the position of the southern carriers with respect to the proposed rates as follows (139 I. C. C. 374, 375):

"The position of the southern respondents is that the proposed rates, although admittedly low and hence not reasonable maximum rates, are not unreasonably low per se or less than reasonable minimum rates, and would not cast a burden on other traffic. In support of that position respondents Chesapeake & Ohio, Hocking Valley, and Norfolk & Western rely upon comparisons of the earnings under the proposed rates with either the average revenues or expenses on all coal or on all freight traffic on their respective lines and upon operating and cost statistics, and, as does also respondent Louisville & Nashville, upon comparisons with divisions of certain rates on coal, with rates and earnings on coal from some of the same and other coal-producing districts to various destinations, and with the rates and earnings on other commodities."

After analyzing these contentions of the southern carriers, and comparing the proposed rates with earnings on other traffic, in the course of which it was shown that in this territory in 1926 the coal traffic constituted 82 per cent. of the total tonnage of the Chesapeake & Ohio, 80 per cent. of that of the Hocking Valley, 88.72 per cent. of that of the Norfolk & Western, and 59.5 per cent. of that of the Louisville & Nashville, the Commission did not find that the rates proposed were unreasonably low per se or that they would cast a burden upon other traffic, but came to what it evidently considered the controlling factor in the situation in the following language (139 I. C. C. 381 to 382):

"The rates on coal with which the proposed rates have heretofore been compared are not parts of the lake cargo coal-rate structure, but of other and different rate structures, and hence in the nature of collateral comparisons. The rates on lake cargo coal from the southern and other districts in the Appalachian region to Lake Erie ports constitute a definitely interrelated rate structure in which the rates on this traffic are, and for many years have been, made independently of those in other coal-rate structures generally. As demonstrating that interrelationship it may be noted that counsel for the Norfolk & Western and Virginian stated at the hearing that the reduced rates here proposed by those respondents would be withdrawn if the former higher rates in effect prior to August 10, 1927, from the northern districts to Lake Erie ports were restored. *It remains to be determined whether the pro-*

*posed rates are just and reasonable measured by other rates on like traffic in the same rate structure."* (Italics ours.)

After comparing the length of haul and the ton mile earnings on the lake cargo traffic from the various districts, the Commission still further narrowed the basis of its action in the following language (139 I. C. C. 385):

"It is clear from the evidence that the publication of the proposed rates from these southern districts was actuated primarily by the reduction in the rates on like traffic from the Ohio No. 8, Cambridge, and Pittsburgh districts established pursuant to our report and order on further hearing in Lake Cargo Coal Rates, 1925, and not by the reduction in the rate from these four southern Ohio districts. The southern operators admit that they are little concerned with competition from the Hocking district, and that commercially it makes no difference to them what the rate is from that district. *It is apparent, therefore, that the primary concern in this proceeding is the rate relation between the Ohio No. 8, Cambridge, and Pittsburgh districts, on the one hand, and the southern districts, on the other."* (Italics ours.)

The Commission then laid down the principle upon which its denial of the proposed rate reduction was based as follows (139 I. C. C. 386 to 387):

"Little or no effort was made by the southern respondents to prove that the proposed rates are just and reasonable, *measured by the rates on like traffic from the Ohio No. 8, Cambridge, and Pittsburgh districts. Their position, in substance, is that in the absence of undue prejudice and preference the only limitation on the measure of the proposed rates is that they shall not be less than minimum reasonable rates per se or be so low as to cast a burden on other traffic.* That construction of the law, as we view it, is too narrow. Section 1 [49 USCA § 1; Comp. St. § 8563] declares that rates shall be just and reasonable, and prohibits every unjust and unreasonable rate. *In other words, it requires that rates shall not only be reasonable per se, but just and reasonable in their relation to other rates on like traffic in the same territory that afford a proper standard of comparison,* and applies to instances in which rates are below that standard, distance and transportation conditions considered, no less than to those in which the rates exceed that standard. Prior to the enactment of the transportation act, 1920, violations of section 1 could be corrected only by the prescription of maximum reasonable rates. Under the interstate commerce act, as amended by the Transportation Act of 1920, we are em-

powered, whenever, after full hearing, we find that any rate is or will be unjust or unreasonable, or otherwise in violation of any of the provisions of that act, to determine and prescribe what will be the just and reasonable rate to be thereafter observed, or the maximum or minimum, or the maximum and minimum, to be charged. The provisions of section 1 are as broad in scope as the power conferred for its administration. * * *

"The rates on lake cargo coal from these districts are, as previously explained, parts of a definitely interrelated rate structure on like traffic. *The rates from the Ohio No. 8, Cambridge, and Pittsburgh districts were prescribed by us as maximum reasonable rates.* There is no contention that those rates exceed that limit. *They afford, therefore, appropriate and fair standards for determining whether the proposed rates are just and reasonable, distance and transportation conditions considered."* (Italics ours.)

That the real basis for denying the proposed reduction was the fact that the southern carriers had a much longer haul, and that the differential of 25 cents was considered too small as compared with the haul, even though the rates from the northern field were lower, and this because of the shift of traffic from the northern to the southern field, clearly appears from the following paragraph of the report (139 I. C. C. 389 to 390):

"We have frequently said that distance alone is only one of the elements which must be considered in determining upon a lawful rate adjustment; and in competitive adjustments the carriers may disregard distance even in substantial degree, *so long as the competitor whose geographical location is largely disregarded is not injured thereby, but where it is made to appear in an interrelated adjustment such as that with which we are here dealing that such a competitor is injured and is complaining, we believe that a proper interpretation of the law which we administer demands a remedy.* This does not mean that even then distance may not be to some extent disregarded, particularly in coal-rate adjustments, but it does mean that differences in distance such as those before us, which are 115.5 per cent. and 88.4 per cent., respectively, of the straight average distances from the Pittsburgh district and from the Hocking, Jackson county, and Pomeroy districts to the lake, require greater recognition than the proposed differences in rates, which are only 17.1 per cent. and 19.6 per cent., respectively, of the rates from the same districts, would accord to them." (Italics ours.)

Another principle laid down by the Com-

mission as controlling its action was that the burden of justifying the reduced rates was upon the carrier proposing them (139 I. C. C. 390), and it stressed the fact that the southern carriers did not show that the low differential for increased distance was justified by lower cost of operation than that of the northern carriers (387 to 388). It justified the testing of the reasonableness of a minimum rate by comparison of same with a maximum by comparing differentials established on other routes for other traffic.

The Commission pointed out that, under section 15 (a), par. 2, of the Interstate Commerce Act, as added by section 422 of the Transportation Act of 1920 (49 USCA § 15a, par. 2; Comp. St. § 8583a, par. 2), it had adjusted the rates from the Appalachian coal districts and had grouped the carriers as required by the act; that the reduction to the northern field was authorized by the proviso of that paragraph; but that the reduction to the southern field would create no new traffic and would reduce the aggregate income of the carriers. It held, further, that the carriers had not shown justification for the rates under the Hoch-Smith Resolution (49 USCA § 55; Comp. St. § 8583aa), saying (139 I. C. C. 395):

"To accord to a carrier the right to transport a substantial portion of its tonnage at rates upon the obviously low level here proposed, while giving no relief to the agricultural industry, including live stock, which Congress has declared to be in a depressed condition and entitled to the lowest possible lawful rates consistent with the maintenance of an adequate transportation system, is counter to that mandate. The Hoch-Smith Resolution is not directed to the carriers; it is directed to us. *Carriers who seek our approval of rate proposals will be expected to show that a finding of justification can be made consistently with the policies outlined for us in the resolution. This has not been done in this proceeding.* * * * We find that the proposed rates have not been justified. We shall require the cancellation of the suspended schedules and discontinue this proceeding." (Italics ours.)

On March 8th, the report of the Commission was amended so as to insert a finding that the proposed rates were unjust and unreasonable, which was not contained in the original report, the finding there being merely that the rates had not been justified.

It is perfectly evident from a study of the foregoing reports of the Commission that, in reducing the rates from the northern field, and in directing the cancellation of the reduction from the southern field, the Commission was primarily concerned, not in fixing rates, but in fixing the differential which was to prevail between the two fields, and that, in expanding the differential to 45 cents and in refusing to allow the old differential of 25 cents to be restored, the Commission based its action upon the shift of tonnage from the northern to the southern field and the industrial conditions resulting therefrom. That this was the basis of the Commission's action appears not only from the language of the reports which we have quoted, but also from an analysis of the existing situation and the necessary effect of the order. The rates proposed were not so low as to burden other traffic or prevent the carriers realizing a reasonable return on invested capital or value, and the Commission did not order their cancellation on any such ground. Even after the reduction they would be 25 cents higher than the rates from the northern field; consequently, considered independently of such matters as the cost of production of coal, they could not have interfered with the traffic of roads having a rate 25 cents per ton lower. The only way in which they could be said to interfere with the traffic from the northern field, would be that on account of the difference in industrial conditions in the two fields, the southern field would be able to undersell and get the business even though paying a rate 25 cents per ton higher, whereas it would not be able to undersell if the differential were made higher than that. But it must be manifest that increasing the differential to meet such a situation is not regulation of rates, but regulation of industrial conditions under the guise of regulating rates. It means nothing more nor less than that, because one community is able to produce coal more cheaply than another, and thereby get a large share of the business which has been going to the other, even though paying a considerable differential in freight, the Commission is placing upon it a handicap by increasing the differential in rates and thereby equalizing the advantage which it has in a low cost of production. It matters not what this may be called, it is in essence a regulation of industrial conditions through manipulation of rates.

It is said that the increase of the differential resulting from the lowering of the rates from the northern field and the cancellation of the reduced rates from the southern field is justified by the longer haul from the southern field; but rates are not fixed upon a mileage basis, and the rate for the longer haul, if higher than the rates of competing roads or rates from competing communities, cannot be of consequence to any one except

the carriers concerned, unless they result in such impairment of earnings as to make the rates unreasonably low per se; that is, so low as not to yield a reasonable return upon the investment of the carrier or throw an undue burden upon other traffic. The Commission recognizes that length of haul is not in itself a sufficient reason for increasing the differential or refusing a reduction which would leave the rate higher than rates from competing communities, and comes back to the proposition that the change is justified because of conditions in such communities. In a passage previously quoted it says: "In competitive adjustments the carriers may disregard distance, even in substantial degree, so long as the competitor whose geographical location is largely disregarded is not injured thereby; but where it is made to appear in an interrelated adjustment, such as that with which we are here dealing, that such a competitor is injured and is complaining, we believe that a proper interpretation of the law which we administer demands a remedy." How could a competitor who is complaining be injured by a rate higher than his rate? The question answers itself. He could not be injured by the higher rate. If there be injury, it is because of difference in other conditions, not rates; and if the differential be increased in favor of the community enjoying the lower rates, it is not the baneful effect of rates which is removed, but the effect of unequal industrial conditions, which is obviated by increasing the difference in rates in favor of the community already enjoying the lower rate.

In this connection it is of interest to note that in proceedings under section 3 of the Interstate Commerce Act (49 USCA § 3; Comp. St. § 8565), where it is unquestionably proper to consider length of haul in determining whether the rates fixed by the same carrier for different communities are unduly prejudicial, the Commission will not condemn rates on that ground, even where the rate relationship may appear improper measured by distance, in the absence of proof of injury. Boston Port Differential Case, 95 I. C. C. 539; Perry County Coal Corp. v. East St. Louis Ry. Co., 80 I. C. C. 711. As shown above, a rate relationship cannot be injurious to a community, where the rate which that community enjoys is lower than the rate from a competing community with which it is compared.

[2, 3] Much has been said as to the binding effect of the order entered by the Commission, but the law with regard thereto is well settled. If the determination of the Commission finds substantial support in the evidence, the courts will not weigh the evidence, nor consider the wisdom of the Commission's action, which, within the scope of its jurisdiction, is conclusive, unless there be some irregularity in the proceeding or some error in the application of rules of law. Chicago, R. I. & Pac. Ry. v. U. S., 274 U. S. 29, 33, 47 S. Ct. 486, 71 L. Ed. 911; Virginian Ry. Co. v. U. S., 272 U. S. 658, 47 S. Ct. 222, 71 L. Ed. 463; Western Paper Makers' Chem. Co. v. U. S., 271 U. S. 268, 46 S. Ct. 500, 70 L. Ed. 941. If, however, in making the order complained of, the Commission has exceeded its powers, or has proceeded upon an erroneous theory of law, or if its action is so manifestly arbitrary and unreasonable as virtually to transcend the authority conferred upon it, the courts are not bound by its action. Southern Pacific Co. v. I. C. C., 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283; I. C. C. v. Union Pacific Co., 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308; U. S. v. N. Y. C. R. R., 263 U. S. 603, 44 S. Ct. 212, 68 L. Ed. 470; U. S. v. New River Co, 265 U. S. 533, 540, 44 S. Ct. 610, 68 L. Ed. 1165.

We think that the enforcement of the order here complained of should be enjoined: (1) Because the Commission exceeded its powers, in that its action was based, in part, at least, upon industrial conditions, and was essentially an effort to equalize industrial conditions or offset economic advantages through adjustment of rates; (2) because it proceeded upon an erroneous theory of law, in holding that the burden was upon the southern carriers to justify a reduction of rates by a comparison of the reduced rates with lower maximum rates prescribed for a competing field; and (3) because it proceeded upon an erroneous theory of law, in holding that the burden was upon the carriers here to justify the proposed reduction of rates under section 15 (a) (2) of the Interstate Commerce Act, as added by section 422 of the Transportaton Act of 1920 and the Hoch-Smith Resolution. We shall consider these in order.

[4-6] If we are correct in our analysis of the reports of the Commission, there can be no doubt that it exceeded its powers. Of course, since the passage of the Transportation Act of 1920 (49 USCA § 71 et seq.; Comp. St. § 10071¼ et seq.), the Commission has the right to prescribe minimum rates, and we agree with the Commission that a construction of the law is too narrow which limits its right to prescribe such rates to cases where the rates proposed are unreasonable per se, or are so low as to cast a burden on other traffic. It has the right to prescribe minimum rates also to prevent ruinous rate wars and to guarantee reasonable earnings, not only to the

carriers affected, but also to competing carriers, who may labor under a higher cost of doing business. New England Divisions Case, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; Dayton-Goose Creek R. Co. v. U. S., 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472. And where the Commission fixes a rate or prescribes a minimum in the exercise of the powers conferred upon it, the courts will not interfere with its action, however much they may disagree with its reasoning. The Commission does not have the right, however, to regulate industrial conditions under the guise of regulating rates. And in a case like this, where there is no rate war, where there is no finding that the rates condemned will deprive the carriers of a fair return, and where they cannot injure competing carriers or carriers from a competing locality because they are actually higher than the maximum rates which such carriers may charge, the Commission does not have the right under the law to prohibit the reduction because of a shift in traffic which has occurred from the locality having the lower to the locality having the higher rate.

As pointed out above, for the Commission to fix rates upon such a basis is for it to assume the task of equalizing industrial conditions through rate adjustments. We do not think that Congress could give such power to the Commission. Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724. We are perfectly certain that it has not attempted to do so. It is provided that carriers shall establish "just and reasonable rates." U. S. C. tit. 49, § 1 (4), 49 USCA § 1 (4); Comp. St. § 8563(4). It is made unlawful for any carrier "to make or give any undue or unreasonable preference or advantage to any particular person * * * or locality" section 3 (1), 49 USCA § 3 (1), Comp. St. § 8565(1). The Commission is given power to determine and prescribe "what will be the just and reasonable * * * rate * * * to be thereafter observed * * * or the maximum or minimum, or maximum and minimum, to be charged." Section 15 (1), 49 USCA § 15 (1); Comp. St. § 8583(1). But nowhere is it provided that in doing so the Commission may prefer one section of the country over another, or that it may fix rates, or may prevent the fixing of rates by the carriers, with a view of placing competing producers upon an equality or of compensating for disadvantages under which competing communities may labor. Manifestly such a power is not conferred by the statutes referred to, for rates fixed with such an end in view are not "reasonable," but are unreasonable and constitute an unprecedented interference with the industrial conditions of the country.

In the Ashland Fire Brick Case, 22 I. C. C. 115, 121, Commissioner Franklin K. Lane said: "It seems unnecessary here to state that the power has not been lodged with this tribunal to equalize economic advantages, to place one market in competition with another, or to treat all railroads as a part of one great whole." And in I. C. C. v. Diffenbaugh, 222 U. S. 42, 46, 32 S. Ct. 22, 24, 56 L. Ed. 83, Mr. Justice Holmes says that the Interstate Commerce Act "does not attempt to equalize fortune, opportunities or abilities."

In the Willamette Valley Rate Case, 14 I. C. C. 61, So. Pac. Co. v. I. C. C., 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283, the Commission held a $5 rate on lumber unreasonable. Its report showed that the holding was based primarily on the view that the rate would be unjust to lumber dealers who had established their business in the Valley on the faith of a $3.10 rate. There was some evidence bearing upon the reasonableness of the $3.10 rate; but in that case, as we think in this, the report of the Commission showed that its action was based primarily upon a consideration of the effect of the rate on industry. The Circuit Court (177 F. 963) refused to enjoin the order of the Commission, but this was reversed by the Supreme Court in a unanimous decision, the opinion being written by Chief Justice White. What he said in that case is pertinent here. Said he:

"What was the nature and character of the order made by the Commission? That is, what, in substance, was the power which the Commission exerted in making the order? Coming to the consideration of that subject, we are of opinion that the court below erred in not restraining the enforcement of the order complained of, because we see no escape from the conclusion that the order was void because it was made in consequence of the assumption by the Commission that it possessed the extreme powers which the railroad companies insist the order plainly manifests. We proceed very briefly to state the reasons which compel us to this conclusion. In the first place, when the complaint which was made to the Commission and the answer of the railroad companies to that complaint are considered they give rise to the inference that in substance the subject complained of was not the intrinsic unreasonableness of the new rate which the railroad companies substituted for the former rate, but the injury it was thought would be suffered from not continuing the old rate in force, an injury arising from circumstances extrinsic to the new rate;

that is, a loss which would be suffered by substituting the higher rate, even if that rate was in and of itself reasonable and just. * * * While it is true that the opinion of the Commission may contain some sentences which, when segregated from their context, may give some support to the contention that the order was based upon a consideration merely of the intrinsic unreasonableness of the rate which was condemned, we think when the opinion is considered as a whole in the light of the condition of the record to which we have referred it clearly results that it was based upon the belief by the Commission that it had the right under the law to protect the lumber interests of the Willamette Valley from the consequences which it was deemed would arise from a change of the rate, even if that change was from an unreasonably low rate which had prevailed for some time to a just and reasonable charge for the service rendered for the future."

Although this decision was rendered prior to the passage of the Transportation Act of 1920, there is nothing in the Transportation Act which justifies the assumption of the power to raise and lower rates or to prevent rates being lowered in order that industries may be put upon a competing basis or that those near a market may enjoy the advantage of their location. That act does provide that in the exercise of its power to prescribe just and reasonable rates the Commission shall establish them so that carriers as a whole or in rate groups will earn a fair return upon the value of their property. Section 15 (a) (2). And in the exercise of this power the Commission can undoubtedly establish minimum rates higher than required for a fair return to the carriers more favorably situated in order that a fair return may be realized by competing carriers less favorably situated and that an efficient transportation system may be thus afforded to the sections served. Dayton-Goose Creek Ry. v. U. S., 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472; New England Divisions Case, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605. But we are satisfied that it was never intended by the act that, in exercising this power, the Commission should consider the loss of business of one community due to industrial conditions and attempt to restore it by increasing the differential in the freight rates between that community and others which compete with it. As said by the Supreme Court, in construing section 3 of this act (49 USCA § 3; Comp. St. § 8565), in the Swift Lumber Company Case, U. S. v. Ill. Cent. R. Co., 263 U. S. 515, 524, 44 S. Ct. 189, 193, 68 L. Ed. 417:

25 F.(2d)—30½

"The law does not attempt to equalize opportunities among localities; * * * the difference in rates cannot be held illegal, unless it is shown that it is not justified by the cost of the respective services, by their values, or by other transportation conditions." Of course, in that case the Supreme Court was dealing with a case of undue prejudice under section 3, where the rates were those of the same carrier; but the rule stated would seem to apply with greater force where the inquiry is merely as to reasonableness and the rates are offered to different communities by different carriers.

[7] The Commission seems to have thought that it was justified in considering industrial conditions and the shift in traffic as a reason for widening the differential because of the provisions of the Hoch-Smith Resolution. 126 I. C. C., bottom page 362. And in condemning the reduced rates which would have restored the old differential it says that the carriers have not shown that they are justified under that resolution. We do not think, however, that the Hoch-Smith Resolution, 43 Stat. 801, c. 120, was intended to confer, or did confer, any such power upon the Commission. That resolution declared it to be the true policy in rate making that the Commission should consider the conditions which at any given time prevail in our several industries, in so far as it is legally possible to do so, "to the end that commodities may freely move." It then provided:

"That the Interstate Commerce Commission is authorized and directed to make a thorough investigation of the rate structure of common carriers subject to the Interstate Commerce Act, in order to determine to what extent and in what manner existing rates and charges may be unjust, unreasonable, unjustly discriminatory, or unduly preferential, thereby imposing undue burdens, or giving undue advantage as between the various localities and parts of the country, the various classes of traffic, and the various classes and kinds of commodities, and to make, in accordance with law, such changes, adjustments, and redistribution of rates and charges as may be found necessary to correct any defects so found to exist. In making any such change, adjustment, or redistribution the commission shall give due regard, among other factors, to the general and comparative levels in market value of the various classes and kinds of commodities as indicated over a reasonable period of years to a natural and proper development of the country as a whole, and to the maintenance of an adequate system of transportation. In the progress of

such investigation the commission shall, from time to time, and as expeditiously as possible, make such decisions and orders as it may find to be necessary or appropriate upon the record then made in order to place the rates upon designated classes of traffic upon a just and reasonable basis with relation to other rates. Such investigation shall be conducted with due regard to other investigations or proceedings affecting rate adjustments which may be pending before the Commission.

"In view of the existing depression in agriculture, the Commission is hereby directed to effect with the least practicable delay such lawful changes in the rate structure of the country as will promote the freedom of movement by common carriers of the products of agriculture affected by that depression, including live stock, at the lowest possible lawful rates compatible with the maintenance of adequate transportation service: Provided," etc.

So far as it affects the question here, this resolution does no more than authorize the Commission to grant relief against rates found to be unjustly discriminatory or unduly preferential, thereby imposing "undue burdens or giving undue advantages." But, as pointed out above, a rate could not be said to give an undue advantage to a locality as against a competing locality or to impose an undue burden on such competing locality where it is actually higher than the rate which the competing locality enjoys.

So far as the general language of the resolution is concerned, to the effect that the conditions which prevail in industry should be considered in adjusting freight rates, to the end that commodities may freely move, this is no more than a general declaration that freight rates shall be adjusted in such way as to provide the country with an adequate system of transportation, and Congress certainly did not intend by this language to create in the Commission an economic dictatorship over the various sections of the country, with power to kill or make alive. If the Commission has the right in a rate adjustment to consider the shift in traffic to a community already paying a higher rate, and act upon it as one of the factors in still further widening the rate differential, its power to control the economic development of the country is practically unlimited. / The shift in cotton manufacturing, in fruit growing, in furniture manufacturing, in short in every branch of industry, will become a matter for consideration by the Commission; for all depend upon freight rates, all have rates in which the differential between long and short hauls is narrow, and all experience periods when there are shifts of traffic from one section to another, due to varying industrial conditions. We feel perfectly certain that Congress did not intend to vest such power in the Commission. And the fact that the Commission seemed to consider that the Hoch-Smith resolution required it to consider or give effect to industrial conditions and the shift of traffic, or at least showed a spirit and purpose in that regard which should be deferred to, is of itself sufficient to invalidate the order complained of. U. S. v. N. Y. Cent. R. R., 263 U. S. 603, 610, 44 S. Ct. 212, 68 L. Ed. 470.

[8, 9] 2. Coming to the second ground of invalidity, which is that the Commission proceeded upon an erroneous theory of law in holding that the burden was upon the southern carriers to justify the proposed reduction by comparison of the proposed rates with lower maximum rates from another field, we would observe that an error as to the burden of proof in the sense of the duty to go forward with the evidence or to produce the preponderance thereof would not be ground to interfere with the action of the Commission, for, of course, we do not attempt to control matters of procedure before it. Here, however, the failure to meet the burden imposed to show certain things meant adverse action by the Commission on the proposed reduction of rates, and it therefore becomes a vital question as to whether it was legally necessary that these things be shown.

In the first place, the Commission placed upon the carrier the burden of justifying the proposed reduction and ordered the cancellation of the rates because they were not justified. (We are attaching no importance to the mere verbiage of the concluding portion of the report; for the finding that the rates were unjust and unreasonable because the carriers had not met the burden of justifying them is the same thing as finding that they were not justified.) In this we think there was error. Carriers still have the right to initiate rates. U. S. C. tit. 49, § 1 (4), 41 Stat. 475 (49 USCA § 1 (4); Comp. St. § 8563(4); U. S. v. Ill. Cent. R. Co., 263 U. S. 515, 522, 44 S. Ct. 189, 68 L. Ed. 417. The Commission, it is true, upon the filing of a new rate, has the right to suspend it and enter upon a hearing as to its lawfulness. U. S. C. tit. 49, § 15 (7), 41 Stat. 486 to 487 (49 USCA § 15(7); Comp. St. § 8583(7). But upon such hearing the burden is upon the carrier to justify an increased rate, not to justify a rate reduction. The portion of the statute applicable thereto is as follows:

"At any hearing involving a rate, fare,

or charge increased after January 1, 1910, or of a rate, fare, or charge sought to be increased after the passage of *this act*, the burden of proof to show that the *increased* rate, fare, or charge, or proposed *increased* rate, fare, or charge, is just and reasonable shall be upon the carrier." (Italics ours.)

It will thus be seen that, in the very act which for the first time gave to the Commission the power to establish minimum rates and prevent reductions, there was incorporated a provision placing upon carriers the burden of justifying only an *increased* rate. This is of importance, not only upon the principle "Expressio unius est exclusio alterius," but also because it expresses a legislative policy favoring low rates. There is all of the difference imaginable between a proposition to raise and one to lower rates. In the former case, the natural presumption is that the carrier will charge what the traffic will bear, and before he is allowed to increase his charges he should show that the increase proposed is justified by cost of operation or other valid criterion. Furthermore, the matters justifying the increase are matters peculiarly within the knowledge of the carrier proposing it. In the case of a reduction of rates, however, the self-interest of the carrier can ordinarily be depended on to guard against too great a reduction; and the reasons for denying the reduction, such as the effect on other carriers, are matters which are not peculiarly within the knowledge of the carrier offering the reduction, and could be better shown by the carriers injuriously affected. Where carriers are willing to reduce rates and thus give the public the benefit of a lower cost of transportation, we think that the burden should be upon those who oppose the reduction to show that it should not be granted, and not upon those who offer it to show that it should be. A reduction of rates is ordinarily beneficial to the public, and before it is denied the contrary should be made to appear. Here, it is shown that the carriers voluntarily offered a reduction of rates which would give the public cheaper coal, and we think that the Commission acted upon an erroneous legal theory in requiring that the rates be rescinded, not on the ground that they were shown to be too low, but because they had not been justified by the carriers proposing them.

In this connection, we feel that the interest of the public or of the consumers of coal who will benefit by the reduction in rates offered by the carriers ought not be lost sight of. As said in Galloway Coal Co. v. A. G. S. R. R. Co., 40 I. C. C. 311, consumers should be given the widest possible markets consistent with justice to the carriers, and carriers, as a matter of traffic policy, may accord competing producing centers located at different distances from common centers of production identical rates. And with respect to the power to fix minimum rates the Commission said in the Sugar Cases of 1922, 81 I. C. C. 448, 472: "We believe, however, that this power should be sparingly exercised and only in cases where it clearly appears that its exercise is necessary in order that substantial public injury may be avoided." While the interest of consumers is not a matter of course, which establishes the burden of proof, it serves to illustrate the unsoundness of the rule applied by the Commission. Are the consumers of coal of the northwest to be denied the benefit of a reduction in rates which the carriers are willing to give them merely because the carriers have not carried the burden of showing that these rates are not unreasonably low as compared with other rates which are still lower? Congress could not have intended such a result. The provision placing the burden on the carrier to justify only an *increase* in rates, shows, we think, that it *did not* intend such a result.

But it appears that not only did the Commission place upon the carriers the burden of justifying the reduction in rates, but also what we think was the absurd and impossible burden of justifying them by comparison with a lower maximum rate prescribed for carriers from a competing community. The $1.91 rate from Kanawha and the $1.66 rate from Pittsburgh were established as reasonable maximum rates from these respective communities by the Commission itself. Later the Commission reduced the reasonable maximum from Pittsburgh to $1.46. This, of course, does not mean that the carriers from Pittsburgh may not fix a lower rate but merely that they may not fix a higher one. The Commission has not fixed a minimum for either Kanawha or Pittsburgh. Nevertheless, when the southern carriers themselves filed a rate only 20 cents under that fixed as a maximum for Kanawha, the Commission has ordered it rescinded merely because the carriers have not shown it reasonable as compared with the maximum rate established from Pittsburgh. We can see how logically a rate might be condemned as too low when compared with a minimum rate from a competing community; but there is certainly no criterion by which it can be thus condemned when compared with a maximum rate. The Commission is in the attitude of saying that it will refuse to allow one road to charge 20

cents per ton less than $1.91 because it has refused to allow a road from a competing community to charge more than $1.46. We think that the standard was wrong, as well as the requirement that the road reducing the rates justify the reduction.

The Commission, in fixing rates, undoubtedly has the power to require that they be high enough to give the carrier a fair return, that they be not so low as to burden other traffic, and that they do not interfere with the earnings of competing carriers, as by being made lower than the rates upon which such carriers can earn a fair return; but there is neither reason nor law for the proposition that rates may be condemned as too low because of their relation to maximum rates from a competing community, where they are actually higher than such rates. Where prescribed by the same carrier, one rate can be condemned by comparison with another only where shown to be prejudicial. Surely a rate prescribed by one carrier may not be condemned by comparison with rates prescribed by another in the absence of such showing. And, a fortiori, the public in such case is not to be denied the benefit of a reduction in rates. We appreciate the fact that we have no power to enjoin action of the Commission because we do not approve of its reasoning; but here we think that there is more wrong with the decision than faulty reasoning. The Commission has imposed upon the carriers as a prerequisite to the reduction of rates the burden of meeting a test of reasonableness not prescribed by the law, and one which we think is repugnant to the law. At least the burden is wrongly imposed, and the criterion adopted accentuates the error with respect to the burden.

It is said that the fixing of maximum reasonable rates by comparison with other rates has been approved, citing Virginian Ry. Co. v. U. S., 272 U. S. 658, 47 S. Ct. 222, 71 L. Ed. 463. And it is argued that minimum rates may be established by the same comparison. The answer is that the Commission in the case at bar did not establish a minimum rate by comparing it with a minimum established for traffic conducted under similar circumstances, but condemned as too low a rate filed by a carrier by comparing it with still lower maximum rates prescribed for traffic from a different field admittedly handled under very different circumstances. It was condemned, not because it was actually too low, but because the carriers proposing it did not justify the lower differential by a comparison of the difference in circumstances; i. e., because they did not show that the

rate which they proposed, 25 cents higher than the rate from the competing field, should not have been higher still, considering the length of haul. It is manifest that the authorities which support the fixing of maximum rates by comparison with rates charged for similar service under like conditions have no application to what was done here.

It is said that the salt rate case, Jefferson Island Salt Mining Co. v. U. S. (D. C.) 6 F. (2d) 315, supports the position of the Commission here, but we do not think so. In that case a system of minimum rates on salt from different localities to a competing market was established; but there was no condemnation of a rate as being too low in relation to a maximum rate from another locality, nor was it asserted that as a prerequisite to a reduction of rates the carrier must establish the reasonableness of the rates as reduced by comparison with such maximum rates. It appeared also in that case that the action of the Commission was taken to prevent ruinous cut rate wars between carriers and prejudicial discrimination between localities. 6 F. (2d) at page 316. Here the Commission expressly found that no rate war was imminent; and, as we have pointed out several times, a rate higher than the rate enjoyed by a community could not be said to constitute prejudicial discrimination against that community.

[10] 3. The third ground upon which we think the order of the Commission invalid is that it proceeded upon an erroneous theory of law, in holding that the burden was upon the carriers to justify the proposed reduction under section 15 (a) (2) of the Interstate Commerce Act, as added by section 422 of the Transportation Act of 1920, and the Hoch-Smith Resolution. We have already adverted to the error of this as regards the Hoch-Smith Resolution. We think it is equally erroneous as regards section 15 (a) (2) of the Interstate Commerce Act, as added by section 422 of the Transportation Act. That section provides:

"(2) In the exercise of its power to prescribe just and reasonable rates the Commission shall initiate, modify, establish or adjust such rates so that carriers as a whole (or as a whole in each of such rate groups or territories as the Commission may from time to time designate) will, under honest, efficient and economical management and reasonable expenditures for maintenance of way, structures and equipment, earn an aggregate annual net railway operating income equal, as nearly as may be, to a fair return upon the aggregate value of the rail-

way property of such carriers held for and used in the service of transportation: Provided, that the Commission shall have reasonable latitude to modify or adjust any particular rate which it may find to be unjust or unreasonable, and to prescribe different rates for different portions of the country."

In Dayton-Goose Creek R. Co. v. United States, 263 U. S. 456, 478, 44 S. Ct. 169, 172 (68 L. Ed. 388, 33 A. L. R. 472) which upheld the validity of section 15 (a) of the Interstate Commerce Act, as added by section 422 of the Transportation Act of 1920, with special reference to the recapture clause, the court said with respect to the new powers given the Commission by the Transportation Act of 1920:

"In both cases (Railroad Commission of Wis. v. C., B. & Q. R. R., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; New England Divisions Case, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605) it was pointed out that the Transportation Act adds a new and important object to previous interstate commerce legislation, which was designed primarily to prevent unreasonable or discriminatory rates against persons and localities. The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission, which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged.

"It was insisted in the two cases referred to, and it is insisted here, that the power to regulate interstate commerce is limited to the fixing of reasonable rates and the prevention of those which are discriminatory, and that when these objects are attained, the power of regulation is exhausted. This is too narrow a view of the commerce clause. To regulate in the sense intended is to foster, protect and control the commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety."

The court held that the validity of the plan provided by the Transportation Act depended on (1) rates which "as a body" enable all the railroads, necessary to do the business of a rate territory or section, to enjoy not more than a fair net operating income on the value of their properties; and (2) on the fact that the carrier was not entitled as of constitutional right to more than such fair net operating income. With respect to the first proposition it said:

"It should be noted that, in reaching a conclusion, upon this first proposition, we are only considering the general level of rates and their direct bearing upon the net return of the entire group. *The statute does not require that the net return from all the rates shall affect the reasonableness of a particular rate or a class of rates.* In such an inquiry, the Commission may have regard to the service done, its intrinsic cost, or a comparison of it with other rates, and need not consider the total net return at all. Paragraph 17 of section 15a (49 USCA § 15a, par. 17; Comp. St. § 8583a, par. 17) makes this clear." (Italics ours.)

And in discussing the second proposition the court used language which seems controlling here. It quoted first with approval the following language of Mr. Justice Lamar in I. C. C. v. Union Pac. R. Co., 222 U. S. 541, 549, 32 S. Ct. 108, 111 (56 L. Ed. 308):

"Where the rates as a whole are under consideration, there is a possibility of deciding, with more or less certainty, whether the total earnings afford a reasonable return. But whether the carrier earned dividends or not sheds little light on the question as to whether the rate on a particular article is reasonable. For, if the carrier's total income enables it to declare a dividend, that would not justify an order requiring it to haul one class of goods for nothing, or for less than a reasonable rate. On the other hand, if the carrier earned no dividend, it would not have warranted an order fixing an unreasonably high rate on such article."

It then proceeded to say: "There is nothing in the act requiring the use of the net return as evidence to fix a particular rate." If the act does not require the use of the net return as evidence to fix a particular rate, it necessarily follows that the burden is not upon the carrier offering a reduction of rates to show that the reduction can be justified with reference to the net return.

We feel sure that no proper interpretation of the act requires that before a carrier

can reduce a particular rate to the public it must show how the net income of all the carriers in that part of the United States will be affected by the reduction. The act as construed gives the Commission power to fix a minimum rate to prevent rate wars, and to prevent the burdening of other traffic or the impairment of earnings either of the road itself or competing roads; but certainly this was as far as Congress intended to go. The railroads are still private property and are subject to private management. When one of them proposes a reduction of rates which is not shown to unduly impair its own earnings, burden other traffic, or injure its competitors, it is nothing short of absurd to say that it must justify the reduction with reference to its effect on the net income of all the carriers in the eastern part of the United States.

The absurdity of attempting to deny a reduction on the general ground that the net operating income of all the carriers in the group will be affected is well illustrated in this case. The Commission has lowered the rates from the northern field by 20 cents per ton. If this results in relieving the distress in the northern field, it means that traffic will be diverted thereto from the southern field. Every ton thus diverted will pay 45 cents per ton less than if hauled from the southern field, and the income of the carriers will be reduced by that amount. If, however, the southern rate is also reduced 20 cents, and the traffic is not diverted, the income of the carriers is reduced only 20, instead of 45, cents. How much would be diverted if the reduction by the southern carriers is not allowed, how much loss this would entail on the southern carriers as compared with gain by the northern carriers, how much, if anything, the net income of the carriers would be increased or diminished, are questions which no one could estimate with even a hope of approximate correctness. We cannot believe that Congress intended that the advantages of a reduction in rates should be made to depend upon the carrier showing anything so impossible of proof as this. When a reduction such as that involved here is offered, if it be shown that it will unduly impair the earnings of the carriers proposing it or will injure competing carriers, that it will unduly burden other traffic or will lead to a rate war, then the Commission may forbid it in the exercise of its power to fix minimum rates (U. S. v. Ill. Cent. R. Co., 263 U. S. 515, 525, 44 S. Ct. 189, 68 L. Ed. 417); but in the absence of such showing it seems clear that the Commission has no power to forbid it under the general grant of power contained in section 15 (a) (2).

[11, 12] *The Question of Jurisdiction.*— Having reached the conclusion that in entering the order complained of the Commission exceeded its powers and proceeded upon erroneous principles of law, the question which presents itself is whether this court has power to grant relief. We think that it has. Suit is instituted by coal producers who are vitally affected by the rates. Some of them were residents of the Southern district of West Virginia, and were heard before the Commission in the proceeding in which the order complained of was entered, and, although not originally parties to the proceeding, they became parties by intervention and were heard as such. We think that the court has jurisdiction under U. S. C. tit. 28, §§ 46 and 47 (28 USCA §§ 46, 47). Chicago Junction Case, 264 U. S. 258, 267, 44 S. Ct. 317, 68 L. Ed. 667. And, although we do not understand that question is raised as to venue, but merely as to jurisdiction, we think that the venue is good under U. S. C. tit. 28, § 43 (28 USCA § 43). Skinner & Eddy Corp. v. U. S., 249 U. S. 557, 39 S. Ct. 375, 63 L. Ed. 772.

It is contended in behalf of the Commission that the court is without jurisdiction to grant the relief prayed for two reasons: (1) Because the order is in effect one denying relief, the enforcement of which cannot be enjoined; and (2) because complainants are not hurt by the order as it affects the railroads and not them. We think that neither of these positions is well taken. The order complained of is not a mere negative order, or one denying relief. It is a positive order to cancel the schedules filed which will put into effect the reduced rates. If they are not canceled as directed by the order, the rates prescribed by them automatically become the rates applicable on the traffic to which they are directed. To say that complainants are not hurt by the order, because it is addressed to the railroad companies, is to close one's eyes to the real situation. The complainant coal producers are served by the carriers. Their only means of reaching the lake ports is over the lines of the carriers and at such rates as they may charge. If, therefore, the order of the Commission is carried out, these producers must pay 20 cents per ton more on every ton of coal shipped than they will be required to pay if the reduced rates prescribed in the schedules are allowed to become effective.

On the first proposition, those who deny jurisdiction rely on U. S. v. New River Co., 265 U. S. 533, 44 S. Ct. 610, 68 L. Ed. 1165;

the Chicago Junction Case, 264 U. S. 258, 44 S. Ct. 317, 68 L. Ed. 667; Mfrs. R. Co. v. U. S., 246 U. S. 483, 38 S. Ct. 383, 62 L. Ed. 831; Lehigh Valley R. R. Co. v. U. S., 243 U. S. 412, 37 S. Ct. 397, 61 L. Ed. 819; Proctor & Gamble Co. v. U. S., 225 U. S. 282, 32 S. Ct. 761, 56 L. Ed. 1091. The rule laid down in the Proctor & Gamble Case, and approved in the other cases cited, is that the courts will not interfere with an order of the Commission denying affirmative relief, because to do so would be to grant the relief which the Commission, in the exercise of its jurisdiction, has denied. Here the order is an affirmative one. It directs the cancellation of the rate schedules which, if not canceled, will prescribe the applicable rate to the commerce in question. In directing their cancellation the Commission exceeded its authority and acted upon erroneous legal principles. If the enforcement of the order is enjoined, the effect is not to grant relief which the Commission has denied, but to prevent it from taking action which it had no legal right to take. See Chicago Grand Junction Case and U. S. v. New River Co., supra.

On the second proposition reliance is placed in the cases of Edward Hines Trustees v. U. S., 263 U. S. 143, 44 S. Ct. 72, 68 L. Ed. 216; Home Furniture Co. v. U. S., 271 U. S. 456, 46 S. Ct. 545, 70 L. Ed. 1033; and I. C. C. v. C., R. I. & P. Ry. Co., 218 U. S. 88, 30 S. Ct. 651, 54 L. Ed. 946. These cases establish the rule that one will not be heard to ask an injunction against the enforcement of an order of the Commission unless he is in some way injured by the order. Thus, in the Hines Case a lumber company was held to have no standing to enjoin the enforcement of an order the result of which was to cancel a demurrage charge which affected its rivals in business but did not affect it. In the Home Furniture Case a shipper was held to have no standing to attack an order of the Commission which permitted one railroad to acquire the stock of another, as the shipper showed no direct legal injury to itself resulting therefrom. In I. C. C. v. C., R. I. & P. Ry. Co., supra, it was held that railroads would be heard to complain of an order only so far as it affected their revenues, not because of its effect on shippers and localities. In the case at bar, however, the complaining shippers are directly injured by the order complained of. If carried out, it means that they must pay 20 cents additional on every ton of coal shipped to the lake ports. This means the loss of millions of dollars to the producers of the southern field and thousands to each of the individual complainants. To say that they have not a legal interest which will be injuriously affected by the illegal order of the Commission is a position which seems to us to answer itself. See Chicago Junction Case, 264 U. S. 258, 266, 44 S. Ct. 317, 68 L. Ed. 667.

To conclude, therefore, we think that in entering the order complained of the Commission exceeded its powers and proceeded upon erroneous theories of law. We think that its action was essentially an effort to equalize industrial conditions or to offset economic advantages by rate adjustments, not warranted by anything contained in the Transportation Act of 1920 or in the Hoch-Smith Resolution. We think that it erred, as a matter of law, in holding that the burden was upon carriers, who had filed schedules reducing rates, to show that the rates as reduced were not unreasonably low as compared with lower maximum rates prescribed for shipments from another field, and in holding that the schedules should be canceled for failure of the carriers to sustain this burden. We think that there was error of law also in the holding that the burden was upon the carriers proposing a reduction of rates to justify the reduction under section 15 (a) (2) of the Interstate Commerce Act, as added by section 422 of the Transportation Act of 1920 or the Hoch-Smith Resolution. For these reasons we think that the order complained of is void; and, as it is affirmative in its nature, commanding the cancellation of rate schedules which will become effective if not canceled, and as complainants will be injured if its enforcement is not enjoined, we have no doubt of the power of the court to grant the injunction prayed. The effect of the injunction will be, as we have already said, to restore the differential which the Commission itself established and which it approved before it reached the conclusion that it was its duty to consider the industrial conditions prevailing in the northern field and the shift of traffic resulting therefrom. It will result in a reduction of rates which the carriers are willing to make and will enable the public to obtain the benefit of a lower cost of transportation. It cannot injure the carriers which serve the competing northern field, because the maximum rate which they can charge is lower than the reduced rates from the southern field. In a word, its only effect will be to prevent the Commission from interfering with industrial conditions in the localities affected and from forbidding a reduction of rates which will preserve the differential that has prevailed for

many years. The injunction prayed will accordingly be granted.

Injunction granted.